# In the United States Court of Federal Claims

No. 22-187C

(Filed: January 8, 2024)

```
*************************************
                                    *
BENFORD ADCOCK, et al.,             *
                                    *
                                    *
                                    *
              Plaintiffs,           *
                                    *
    v.                              *
                                    *
THE UNITED STATES,                  *
                                    *
              Defendant.            *
                                    *
*************************************
```

## OPINION AND ORDER

On February 22, 2022, Plaintiffs Benford Adcock and a group of similarly situated Plaintiffs[1] with properties and businesses in the Yazoo Backwater Area (the "Backwater") located in the Mississippi Delta, filed a Complaint seeking compensation for a Fifth Amendment taking. Plaintiffs allege that the United States Army Corps of Engineers' construction of the Old River Control Complex ("ORCC"), located on a point of the Mississippi River in Louisiana, is responsible for the flooding of their properties.

On April 21, 2023, the United States (the "Government"), moved to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), contending that Plaintiffs' claim is barred by the running of the statute of limitations because Plaintiffs should have been aware of the flooding when the structure was built in 1962. Def.'s Mot. to Dismiss, ECF No. 8. Further, the Government moves to dismiss pursuant to RCFC 12(b)(6) arguing that Plaintiffs fail to state a claim because the Complaint does not contain sufficient factual allegations to demonstrate causation. This matter is now fully briefed and ripe for decision. Oral argument is unnecessary. For the reasons set forth below, the Government's Motion to Dismiss is hereby **DENIED**.

---

[1] This group of Plaintiffs include: (1) farmers who own and/or operate farms in the Backwater; (2) individuals who reside and/or operate businesses or own land for recreational purposes in the Backwater; (3) corporations, partnerships, trusts or other legal entities that own and/or operate businesses in the Backwater or own properties in the Backwater; (4) and other persons or legal entities that owned and/or operated properties, farms and businesses in the Backwater.

1

I.     BACKGROUND

A. Backwater Area

The Backwater covers 926,000 acres and all Plaintiffs live within that acreage. Compl. ¶ 1. This property lies in the shape of a downward pointed triangle with a system of levees on both its east and west sides. *Id*. The southernmost tip of this property comprises of two levee systems, the Steel Bayou Drainage Structure and the Little Sunflower Drainage Structure to the east. *Id*. These two structures are the drains to the Backwater watershed. ECF No. 26 at 7. When the Mississippi River is in flood stage, its waters flow back up the Yazoo River.[2] *See, e.g.*, H.D. 198 at 75 ¶¶ 100-01.[3] This is called backwater flooding. *See, e.g.*, *id.* Plaintiffs allege that they own property in this backwater area between the two levee systems. Compl. ¶¶ 1, 14.

B. The Yazoo Backwater Project

The Yazoo Backwater Project is in the lower Mississippi Delta. Compl. ¶ 1. It is owned and operated by the U.S. Corps of Engineers. The Project protects the landside area from high water in the Mississippi and Yazoo Rivers—backwater flooding. The Yazoo Backwater Project levees are built to a current grade of 107 feet above sea level and protect about 926,000 acres of the south Delta from backwater flooding. Compl. ¶¶ 8-9.

Two water control structures exist within the backwater levees, one at Steele Bayou and the other at the Little Sunflower River. Compl. ¶¶ 73, 75. These control structures feature gates that can be opened to allow runoff and water from other sources in the Delta to drain out of the Backwater Area into the Yazoo River and ultimately down to the Mississippi River. U.S. ARMY CORPS OF ENG'RS, FINAL SUPPL. NO. 2 TO THE 1982 YAZOO AREA PUMP PROJECT FINAL EIS 15–16 (2020), https://www.mvk.usace.army.mil/Missions/Programs-and-Project-Management/Yazoo-Backwater/Yazoo-Backwater-Report/FileId/305778/ ("2020 EIS"); 2020 EIS App. G ¶¶ 77-79.

When the gates are closed, the Project stops high water in the Yazoo from flowing back into the Backwater Area. 2020 EIS 15–16; 2020 EIS App. G ¶¶ 77-79. The last major component of the Project is channel improvement. The Project's channel improvements convey

---

[2] The Yazoo River flows the length of the Mississippi Delta, draining the flatlands and hillier country to the east before emptying into the Mississippi River just upstream of Vicksburg. Its watershed comprises nearly 30% of the State of Mississippi. H.R. DOC. NO. 73-198 at 18 ¶ 18 (1934) ("H.D. 198").

[3] In considering a motion to dismiss, the Court may properly take judicial notice of the contents of public documents such as congressional reports and matters of public record. *Diversified Grp., Inc. v. United States*, 123 Fed. Cl. 442, 452 n.7 (2015), *aff'd*, 841 F.3d 975 (Fed. Cir. 2016); *Bristol Bay Area Health Corp. v. United States*, 110 Fed. Cl. 251, 262 (2013) (citing *Sebastian v. United States*, 185 F.3d 1368, 1374 (Fed. Cir. 1999)); *accord United States v. Archer*, 241 U.S. 119, 132 (1916) (taking judicial notice of "the report of the United States engineers" when describing the dynamics of erosion along the Mississippi River).

runoff to the control structures. 2020 EIS App. G ¶ 74. The Corps completed the structural elements of the Yazoo Backwater Project in 1978. 2020 EIS App. G ¶ 19.

### C. The Old River Control Structure

The Old River Control Structure is a series of federally owned components in the area of the Old River, Red River, Atchafalaya River, and Mississippi River, about fifty miles northwest of Baton Rouge, Louisiana. *See generally* U.S. ARMY CORPS OF ENG'RS, OLD RIVER CONTROL (2009), https://www.mvn.usace.army.mil/Portals/56/docs/PAO/Brochures/ OldRiverControlBrochure.pdf ("Old River Pamphlet"); *see also* Compl. ¶ 28. When engineers recognized that the Atchafalaya River would otherwise capture the Mississippi River through the Old River, the Corps recommended a diversion structure. *See, e.g., id*. at ¶¶ 5-6; *see also* Old River Pamphlet 6.

Congress adopted the Corps' proposal when it passed the Flood Control Act of 1954, Pub. L. No. 83-780, 68 Stat. 1248. *See also* Compl. ¶¶ 7, 25. Following passage, the Corps built the Old River Control Structure. Compl. ¶ 8. In 1955, the Corps began building the Low Sill and Overbank Control Structures. Old River Pamphlet 9. It completed those in 1959. *Id.* In 1962, the Corps finished the necessary connecting channels, at which point the Old River Control Structure began operations.[4] Old River Pamphlet 9; *see also* Compl. ¶ 28. In 1985, private interests began construction on a power plant just upstream of the Old River Control Structure. Old River Pamphlet 15. The plant went into service around 1990. Compl. ¶ 28. The term Old River Control Complex refers to both the federal infrastructure comprising the Old River Control Structure, and the privately owned hydroelectric plant.

### D. Plaintiffs' Complaint

Plaintiffs filed their Complaint on February 22, 2022. ECF No. 1. Their Complaint contains two counts: (1) an alleged "taking of agricultural and other resources without just compensation[,] in violation of the Fifth Amendment"; and (2) an alleged "taking . . . of flowage easements and interests in beneficial use of properties without just compensation[,] in violation of the Fifth Amendment." Compl. at 41–42 (capitalization and emphasis altered). On the surface, Plaintiffs claim that "the construction of the Old River Control Complex" caused flooding of their properties in the Backwater Area. *See, e.g., id.* ¶ 4; *see also id.* ¶ 10 ("As a direct and foreseeable result of the construction and operation of the ORCC . . . ."); *id.* ¶ 46 ("The Corps' design, construction, and subsequent operation of the ORCC . . . resulted in the direct, natural, and foreseeable flooding of Plaintiffs' properties . . . ."). They seek just compensation. The Government now moves the Court to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

---

[4] At that time, the Old River Control Structure consisted of the Low Sill Structure, the Overbank Structure, and the Old River Navigation Lock and Dam. Old River Pamphlet 8; *see also* Compl. ¶ 28. In 1973, Mississippi River flooding damaged the Low Sill Structure. Old River Pamphlet 10; Compl. ¶ 28. Following repairs and additional floods, the Corps built a new inflow channel and Auxiliary Control Structure, which it completed in 1986. Old River Pamphlet 10–12; Compl. ¶ 28.

## II. JURISDICTION AND STANDARD OF REVIEW

The Tucker Act authorizes the Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Claims for damages under the Takings Clause of the Fifth Amendment are within this Court's Tucker Act jurisdiction. *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 12, (1990); *see also Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1368 (Fed. Cir. 2005).

Under 28 U.S.C. § 2501, any claim brought pursuant to the Tucker Act must be filed within six years of when the cause of action accrued. Generally, a claim alleging a Fifth Amendment taking "accrues when the act that constitutes the taking occurs." *Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009).

### A. Standard of Review for Motions to Dismiss Pursuant to RCFC 12(b)(1)

This Court's jurisdiction to entertain claims and grant relief depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). The burden of establishing the Court's subject matter jurisdiction rests with the plaintiff. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). When faced with a motion to dismiss for lack of subject matter jurisdiction, pursuant to the Rules of the Court of Federal Claims ("RCFC") 12(b)(1), a court must assume that all undisputed facts alleged in the complaint are true, and must draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

### B. Standard of Review for Motions to Dismiss Pursuant to RCFC 12(b)(6)

A complaint may be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint, and must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).

"To avoid dismissal" under RCFC 12(b)(6), "a party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662 (2009)).

4

Due to the fact-intensive nature of takings cases, *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005), discovery is often "necessary to determine whether plaintiffs' allegations demonstrate a taking and, therefore, plaintiffs should be given the opportunity to develop facts in support of their claims." *Orr v. United States*, 145 Fed. Cl. 140, 158 (2019).  The Court should therefore exercise care in takings cases not to deny Plaintiffs that opportunity by the precipitous grant of motions to dismiss under RCFC 12(b)(6).

### III. DISCUSSION

#### A. Pursuant to the Stabilization Doctrine, Plaintiffs' Complaint is Within the Statute of Limitations.

The Government argues that the Court lacks subject matter jurisdiction to hear Plaintiffs' claim due to the running of the statute of limitations under 28 U.S.C. § 2501.  Def.'s Mot. at 14-15.  According to the Government, Plaintiffs' claim accrued in 1962 when the Corps completed construction of the Old River Control Structure and began operations.  The Government contends that because the Old River Control Structure was a matter of public knowledge, Plaintiffs could have conducted an inquiry and learned of their potential claims and should have been aware of their claims before 2016 (six years before they filed their Complaint in 2022).  As a result, according to the Government, Plaintiffs' claims are time barred and the Court must dismiss the Complaint.

Plaintiffs, however, contend that their claim did not accrue until after 2016, when the raising of the sediment created a cause of action, and when Plaintiffs could have reasonably expected to know that the action had accrued.  According to Plaintiffs, because the stabilization doctrine applies to this case, the Corps' construction of the OCCR and decision to divert water down the Mississippi River, was not the point of accrual. The sediment of the river had to rise over time to eventually create excessive flooding to Plaintiffs' property.  Plaintiffs argue that at the moment the OCCR was built there was no public knowledge about the problems with sediment building up in the Mississippi River, and certainly no public knowledge that such sediment buildup would damage the individuals in the Backwater.  Thus, any action Plaintiffs brought six years from the time the OCCR was built and put into service would have been obviously premature.

The Government's Motion to Dismiss is denied.  As explained below, the Court accepts Plaintiffs' argument that based on the stabilization doctrine the sediment buildup from the OCCR was a gradual physical process, the effects of which were only known over time.  Therefore, Plaintiffs' claim is within the period of the statute of limitations.  Further, this Court denies the motion because fact-finding is required to determine when stabilization occurred.

The stabilization doctrine contemplates one act of taking, the effects of which are only known over time.  In the case of a gradual physical process such as erosion, the law does not require that the owner sue when the first clod of earth is dislodged.  Sensibly, the law starts the running of the statute of limitations "when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the

damage is foreseeable." *Boling v. United States*, 220 F.3d 1365, 1372 (Fed. Cir. 2000). That is, the law waits until the situation has "stabilized."

The United States Supreme Court in *United States v. Dickinson*, 331 U.S. 745 (1947), established the stabilization doctrine. In that matter, the Government built a dam that flooded Dickinson's property interest, and the Government argued that the claim was barred because the dam was built more than six years before the complaint was filed. The Court explained the difficulties Dickinson would have in filing suit prior to knowing if the parameters of the flooding and the problems of determining damages, surmising that "[a]n owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck." *Id.* The Court found "when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" *Id.* at 749.

Similarly, in this case although the Corps built the OCCR in 1962, the flooding to Plaintiffs' properties was gradual and increased over time as sediment built up and prevented the use of the Steel Bayou and Little Sunflower gates, and thus Plaintiffs could not ascertain the extent and therefore the line of demarcation until well after 2015. Plaintiff points out that although the backwater area experienced heavy flooding as early as 1979 the longevity of the flooding became substantially worse over time, hitting record highs between 2016 and 2019 as depicted by the chart below.

| Year | **Riverside**: Max elevation at Steele Bayou | **Landside**: Max Elevation at Steele Bayou | Days of Backwater Area flooding (above 80') |
|---|---|---|---|
| 1979 | 97.2 | [not recorded] | 104 |
| 1983 | 98.5 | 95.8 | 73 |
| 1984 | 94.5 | 92 | 81 |
| 1993 | 91.5 | 91.5 | 130 |
| 1997 | 98.2 | 93.3 | 101 |
| 1998 | 91.6 | 88.3 | 89 |
| 2002 | 93.7 | 88 | 49 |
| 2003 | 91 | 88.3 | 23 |
| 2005 | 92.8 | 90 | 57 |
| 2008 | 100.1 | 92.2 | 156 |
| 2009 | 96.6 | 93.7 | 148 |
| 2011 | 106.2 | 90 | 132 |
| 2013 | 92.3 | 90.9 | 79 |
| 2015 | 94.1 | 90.6 | 145 |
| 2016 | 99.3 | 92 | 202 |
| 2017 | 97.1 | 88.5 | 53 |
| 2018 | 99 | 95.1 | 81 |
| 2019 | 100 | 98.2 | 219 |

2020 EIS App. G ¶¶ 35–50, 52, 54–58, 61–62, 64–70.  The flooding in this case mirrors the gradual taking which occurred in *Dickinson* as both cases involve a single government act that causes deleterious effects over an extended period of time, and therefore, the stabilization doctrine applies here.  Thus, any action Plaintiffs brought six years from the time the OCCR was built or put into service would have been obviously premature.

   Though the stabilization doctrine applies to this case, it is unclear when the situation at Plaintiffs' properties "stabilized" for purposes of accrual.  Flooding of the kind Plaintiffs challenge—where the riverside elevation is higher and therefore the Yazoo Backwater Project gates are closed—occurred at least fourteen times in the years prior to 2016.  Between 2016 and 2019 the longevity of the flooding became substantially worse than any time since 1979.

   Plaintiffs allege the Corps began to remediate the erosion in 2016.  According to Plaintiff, the Government has claimed it would study and potentially mitigate the matter, including adding pumps to the Backwater side of Steel Bayou.  Plaintiff offers a letter dated July 5, 2016, from Major General Wehr, on behalf of the Corps of Engineers, stating:

> "Over the last several years, [the] river has set new stage records at gaging stations across the valley. One explanation for this is that we are in a cycle with

> greater rainfall . . . . Another possible factor includes the movement of sediment within the system that could affect stages. Our analysis shows both a slight aggradation in the channel bottom at Natchez and degradation of the channel at Vicksburg. We are currently conducting a detailed flowline analysis that will provide more insight as to what is happening in the channel.

Compl. ¶ 61. Additionally, in an October 2016 letter to Mississippi Secretary of State Delbert Hosemann, Major General Wehr stated:

> [T]he Commission appreciates hearing your concerns about the flooding and sedimentation along the Mississippi River from Natchez to the Old River Control Complex and the associated economic impacts. As a result of your testimony, along with testimony from others who testified both on August 17, 2016, and at previous hearings, the Commission has requested the staff of the Mississippi Valley Division, as well as the Hydrologic and Hydraulic staffs from both the New Orleans and Vicksburg Districts undertake a preliminary analysis using hydrodynamic models to ascertain what is happening in this reach of the Mississippi River. These staffs made a field trip to the Lake Mary area on September 21, 2016, to meet with several land-owners to view the problems. This preliminary analysis is being undertaken to evaluate potential benefits and impacts resulting from various operational scenarios at the Old River Control Complex. The preliminary analysis is intended to only provide insight into the impacts of the authorized 70/30 split of the flows between the Mississippi and Atchafalaya Rivers.

Compl. ¶ 62. It would seem, therefore, that the gradual character of the sediment buildup set in motion by the Corps, compounded by the Government's representations that the impact of the flooding is under study, have indeed made accrual of the landowner's claim uncertain. *See Applegate v. United States*, 25 F.3d 1579, 1582 (Fed. Cir. 1994).

      Although the Government argues that at the very least Plaintiffs should have known about the existence of the erosion when the Corps published a report investigating sedimentation at the Old River Control Complex in June 2015,[5] knowledge of erosion alone is insufficient to establish accrual under the stabilization doctrine. Again, as stated previously, "the touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." *Boling*, 220 F.3d at 1372. There is insufficient evidence at this time to determine when the erosion had made "substantial inroads" into the property, or when the situation at Plaintiffs' property stabilized. Determining the point at which "stabilization" occurs is a factual inquiry. *Id.*; *see e.g., Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) ("most takings claims turn on situation-specific factual inquiries"); *Cooper v. United States*, 827 F.2d 762, 764 (Fed. Cir. 1987) ("The point at which the taking becomes sufficiently certain to give rise to a claim for compensation varies in each

---

     [5] The June 2015 Corps' report is entitled "Old River Control Complex Sedimentation Investigation." Compl. ¶ 39.

case."). Until the evidentiary record is more fully developed, dismissal of Plaintiffs' claim would be to impose the "procedural rigidity" that the Supreme Court cautioned against. *See Dickinson*, 331 U.S. at 749.

### B. Plaintiffs State a Valid Takings Claim.

#### 1. Plaintiffs sufficiently allege that their injury was a result of the Government's direct action.

The Government argues, in the alternative, that Plaintiffs' Complaint which alleges that the Corps' failed to open the Yazoo Backwater Project's discharge gates should be dismissed because it targets government inaction, and thus does not adequately plead causation. The Government argues that takings claims cannot rest on inaction. *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1357 (Fed. Cir. 2018). Instead, the Government argues that to establish causation, Plaintiffs must allege what would have happened if the Government had not acted taking into account both the alleged flood increasing government actions, the Old River Control Structure, and the flood-reducing government actions, the Yazoo Backwater Project levees.

In its response, Plaintiffs assert that this case is different from *St. Bernard Parish* as the Complaint clearly establishes a direct action of the Government, intentionally done, with an understanding of its consequences, created the flooding on Plaintiffs' property. The Court agrees.

In *St. Bernard* Parish, the Federal Circuit concluded that the government cannot be liable on a takings theory for inaction and that the government action in constructing and operating the Mississippi River-Gulf Outlet ("MRGO") was not shown to have been the cause of the flooding. The Federal Circuit emphasized that proving this type of claim required Plaintiffs proving that "government action caused the injury to their properties—that the invasion was the 'direct, natural, or probable result of an authorized activity.'" *Id.* at 1359-1360 (quoting *Ridge Line, Inc. v. United States*, 346 F. 3d 1346, 1355 (Fed. Cir. 2003)). Further, the Federal Circuit observed that proof of causation "requires a showing of 'what would have occurred' if the government had not acted." *Id.* at 1362 (quoting *United States v. Archer*, 241 U.S. 119, 132 (1916)).[6]

Here, Plaintiffs are not alleging that the Government's inaction caused damage to their property; rather, Plaintiffs allege that the Governments' building and operating of the ORCC has flooded Plaintiffs' properties.[7] Plaintiffs contend that as a result of the ORCC, water is "unable

---

[6] It held that the plaintiffs did not meet this burden because they did not "present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had been no government action at all." *St. Bernard Parish Gov't*, 887 F.3d at 1363.

[7] In addition, the Government argues that Plaintiffs' Complaint fails to adequately address causation because the Complaint demonstrates that government action did not cause any flooding on their property. Because Plaintiffs' properties flood only when the Yazoo Backwater Project's discharge gates are closed *and* there is separate flooding in the Delta from rain and

to flow unimpeded . . . and massive amounts of sediment have built-up in the Mississippi River in the vicinity of and below the ORCC." Compl. at 9. This sediment buildup has "narrow[ed] the banks and rais[ed] the elevation of the River [,] creating extensive sand bars and other obstructions . . . [and] [a]s a result, the [Steel Bayou and Little Sunflower Drainage] gates cannot be opened in order to drain the Backwater area, and occasional floods have been amplified in frequency, severity, and duration so that they inundate Plaintiffs' properties for months at a time." *Id.* Plaintiffs also allege that the accumulation of sediment and its impacts on water levels upstream were foreseeable consequences of the Corps' construction and operation of the ORCC. Compl. at 31, 36.

Although not stated in the Complaint, Plaintiffs allege that the conclusion drawn from the Complaint is if the ORCC had never been constructed, there would never have been the complained of flooding. ECF No. 26 at 22. Without the ORCC construction the rain and water which falls on the Backwater property would appropriately drain into the Yazoo and Mississippi Rivers. *Id.* With the construction of the ORCC, there is buildup of sediment that directly disturbs the draining of water from the Backwater. *Id.* In the Complaint, Plaintiffs allege that the direct action of the Corps' construction of the ORCC is what caused the flooding on Plaintiffs' property. *Id.* Thus, *St. Bernard Parish* is distinguishable here.

Further, regarding the Government's argument that Plaintiffs' Complaint must take into account both the alleged flood-increasing government actions and the flood-reducing government actions, the Court does not hold that this is an adequate reason to dismiss at this stage.[8] Regardless of the nature of the showing that will be required concerning other Corps flood-reducing actions, *St. Bernard Parish* was before the court of appeals after a trial on the merits. This case is before the Court on a motion to dismiss. The Government will have the opportunity during the merits phase to come forward with evidence that the Corps implemented flood-risk reduction measures that must be taken into consideration under the reasoning of *St. Bernard Parish*. It will then fall to the Plaintiffs to either persuade the Court that the identified actions are not of the type that *St. Bernard Parish* requires it to consider or to address the effect of those actions on its proof of causation.

---

other local water sources, the Government argues that there is a break in the chain of causation. Thus, the Government concludes that Plaintiffs cannot establish an entitlement to relief from the United States. The Government's allegations, in a vacuum, could establish a break in the chain of causation. The Court holds below, however, that Plaintiffs have plausibly alleged that the damage to their properties was foreseeable.

[8] In *State of Mississippi*, the Government similarly filed a Motion to Dismiss arguing that Plaintiffs failed to plead causation because the complaint targets government inaction, but the motion was dismissed as premature. *See State of Mississippi, et al. v. United States,* Nos. 19-231 L/19-258 L (alleging the Government raised the sediment level in the Mississippi River to the extent that their property flooded excessively). Judge Elaine Kaplan, on February 6, 2020, explained *St. Bernard Parish* "cannot be read to require Plaintiffs to show what would have occurred on their land had the Corps undertaken no flood protection action at all on the lower Mississippi River." Order Denying in Part and Granting in Part Government's Motion to Dismiss Mississippi Action at 12. This Court finds that this reasoning is persuasive.

At this stage in the litigation, Plaintiffs are not required to include allegations in their Complaint that address the effects of unspecified flood-risk reduction actions undertaken by the Corps. *See Ouebedeaux v. United States*, 112 Fed. Cl. 317, 321-22 (2013) (rejecting the argument that "a party pleading a takings must address every facet of its claim, including likely defenses, in the complaint" and observing that to avoid dismissal "plaintiffs did not need specifically to aver that the harm caused by the flood here exceeded the benefits provided to plaintiffs by [a] flood control project"). Taken as true and with all inferences resolved in their favor, Plaintiffs' allegations that the ORCC's construction and operation caused flooding of a duration and severity that would not have occurred in its absence are sufficient to state a claim for relief.

### 2. Plaintiffs' Complaint sets forth allegations that satisfy both parts of the *Ridge Line* test.

Second, the Government contends that Plaintiffs' Complaint fails to include factual allegations addressing the correct legal standard for establishing causation. *See St. Bernard Parish Gov't*, 887 F.3d at 1362 ("It is well established that a takings plaintiff bears the burden of proof to establish that the government action caused the injury."). Plaintiffs argue, however, that the Complaint appropriately alleges causation and satisfies both parts of the *Ridge Line* test for causation in takings cases. This Court agrees. First, property loss compensable as a taking "results when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." *Id.* at 1355 (emphasis supplied; internal quote and citation omitted). Notably, this first element is in the alternative and is satisfied by proof of causation. *See Cary v. United States*, 552 F.3d 1373, 1377 (Fed. Cir. 2009) (describing *Ridge Line* as a "two part test that can be characterized as causation and appropriation"); *Hansen*, 65 Fed. Cl. 76, 80 (2005) (describing *Ridge Line's* first element as "*either* government intent to invade or harm that is the direct, natural or probable consequence of government action" (emphasis added)). Second, "an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of time[.]" *Ridge Line*, 346 F.3d at 1356 (citation omitted).

The Complaint set out detailed factual allegations in clear and unambiguous terms that the increased flooding at issue is the "direct, natural, or probable result" of the Corps' construction and operation of the ORCC and subsequent operation of the Steel Bayou and Little Sunflower gates. The Complaint fully alleges the mechanism for the recurring flooding, the obstruction of the natural flow of the River caused by the ORCC, the sediment buildup resulting therefrom, and subsequent flooding on Plaintiffs property.[9]

---

[9] The Government also argues that Plaintiffs' Complaint demonstrates that government action did not cause any flooding on their property. Because Plaintiffs' properties flood only when the Yazoo Backwater Project's discharge gates are closed *and* there is separate flooding in the Delta from rain and other local water sources, the Government argues that there is a break in the chain of causation. Thus, the Government concludes that Plaintiffs cannot establish an entitlement to relief from the United States. The Government's argument does not undermine the validity of Plaintiffs' takings claim. As explained above, Plaintiffs have sufficiently alleged

The Complaint satisfies both prongs of the second part of *Ridge Line*'s taking test, by alleging both that the Government (1) flooded the properties to appropriate a benefit to itself, and that by so doing (2) preempted Plaintiffs' rights to enjoy their properties. First, the Complaint alleges that the Government has caused the flooding of Plaintiffs' properties for its own benefit. In order to save Baton Rouge and New Orleans, avoid flooding the Atchafalaya basin, and maintain the economic benefits of a navigable Mississippi River to the region and the United States ("a benefit to the government"), the United States has taken a flowage easement on Plaintiffs' properties that has substantially damaged timber, agricultural production, and a wildlife and environmental preserve (*i.e.* "at the expense of the plaintiff"). *See, e.g.,* Compl. ¶¶ 5-6, and 9.

Second, by alleging that the Government's actions caused "intermittent but inevitably recurring flooding," the Complaint satisfies the second aspect of *Ridge Line's* second element. The charged flooding "preempt[s] the owner's right to enjoy his [or her or the State's] property for an extended period of time." *Id.* at 1356. As the Supreme Court noted in one of its seminal takings cases (where Wisconsin claimed it did not take plaintiff's property – it just built a dam which flooded the property as a "consequential result"): "[W]here real estate is actually invaded by superinduced additions of water, earth, sand, or other material . . . so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution." *Pumpelly v. Green Bay Co.,* 80 U.S. 166, 181 (1871).

Because the Complaint alleges in concrete and non-conclusory terms that the increased flooding at issue was the "direct, natural or probable result" of Governmental action (satisfying *Ridge Line's* first element), and that the Government's actions in connection with the ORCC "appropriate[d] a benefit to the government at the expense of the property owner," or "at least preempt[ed] the owners['] right[s] to enjoy [their properties]" (satisfying *Ridge Line's* second element), the Complaint properly alleges a taking. *Ridge Line*, 346 F.3d at 1356 (citing *Southern Pac. Co. v. United States*, 58 Ct. Cl. 428 (1923)). Plaintiffs' allegations regarding the effects of the Corps' actions on their properties, taken as true, state a claim for relief under the Fifth Amendment. Therefore, the government's motion under 12(b)(6) is denied.

### IV.    CONCLUSION

For the reasons set forth above, the Court **DENIES** the Government's Motion to Dismiss. The Government shall file its Answer to the Complaint within 60 days from the date of this Opinion and Order.

**IT IS SO ORDERED.**

---

that the flooding was a natural consequence of the Corps' actions. There is no requirement under these circumstances that Plaintiffs provide greater specificity—particularly at the pleading stage. Again, a plaintiff asserting a takings claim need not address every likely defense in its pleading. *See Ouebedeaux,* 112 Fed. Cl. at 321-22.

<u>s/Edward J. Damich</u>  
EDWARD J. DAMICH  
Senior Judge